[Cite as *Torrance v. Rom*, 2020-Ohio-3971.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

RONALD TORRANCE, ET AL.,  :

    Plaintiffs-Appellants,  :

                            No. 108818

    v.  :

DAVOR ROM, ET AL.,  :

    Defendants-Appellees.  :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED IN PART,
                 AND REMANDED
**RELEASED AND JOURNALIZED:**  August 6, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-900390

---

### *Appearances:*

DJKovach Law, L.L.C., and David J. Kovach, *for
appellant.*

Blocker Law, L.L.C., and David S. Blocker, *for appellees.*

EILEEN T. GALLAGHER, A.J.:

{¶ 1} Plaintiff-appellant, Ronald Torrance ("Torrance"), appeals from the trial court's judgment dismissing his complaint against defendants-appellees (collectively "the appellees"), IIP Management, L.L.C. ("IIPM") and Violetta

Varenkova ("Varenkova"), pursuant to Civ.R. 12(C). Torrance raises the following assignment of error for review:

> 1. The trial court committed reversible error when, pursuant to Civ.R. 12(C), Ohio Rules of Civil Procedure, it dismissed the claims for (1) breach of property-management agreements, (2) breach of fiduciary duty, (3) violation of the Ohio Deceptive Trade Practices Act, and (4) civil conspiracy which Torrance asserted against appellees.

**{¶ 2}** After a careful review of the record and relevant case law, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. The trial court did not err by dismissing Torrance's claims for breach of contract and breach of fiduciary duty because Torrance does not have standing to pursue these claims against the appellees. However, construing the material allegations in the complaint in favor of Torrance as true, we are unable to conclude, beyond doubt, that Torrance could prove no set of facts in support of his claims for violation of the Ohio Deceptive Trade Practices Act ("ODTPA") and civil conspiracy that would entitle him to relief. Accordingly, we find the trial court erred in dismissing these claims pursuant to Civ.R. 12(C).

## I. Procedural and Factual History

**{¶ 3}** This civil action stems from allegations that Torrance was defrauded by the appellees and their codefendants Davor Rom ("Davor"), Daniel Rom ("Daniel"), Anthony Halsall ("Halsall"), Assets Unlimited, L.L.C. ("Assets Unlimited"), IIP Ohio, L.L.C. ("IIP Ohio"), IIP Cleveland Regeneration, L.L.C. ("ICR"), IIP Cleveland Regeneration 2, L.L.C. ("ICR2"), Property Hotline, L.L.C.

("PH-Ohio"), and Property Hotline Ltd. ("PH-England") (collectively "the defendants").

**{¶ 4}** Torrance is a resident and citizen of Scotland. On November 11, 2014, the limited liability company, Realty World Traders, L.L.C. ("RWT"), was organized to facilitate Torrance's real-estate investments in Ohio. Torrance was the sole member of RWT until he sold his membership interest in the company in April 2017.

**{¶ 5}** IIPM is a property management company that provides certain services for property owners, including rent collection, property maintenance, property repairs, and the disbursement of contractual mortgage payments, property taxes, special assessments, and insurance premiums. During relevant time periods of this case, Varenkova served as the director of operations for IIPM.

**{¶ 6}** Prior to the organization of RWT, Torrance entered into a purchase and sale agreement with ICR on November 4, 2014, for real property located on Greenhurst Drive in Maple Heights, Ohio (the "Greenhurst property"). On the same date, Torrance entered into two separate purchase and sale agreements with ICR2 for real property located on Beachview Drive in Euclid, Ohio (the "Beachview property"); and Corkhill Road in Maple Heights, Ohio (the "Corkhill property"). Each purchase and sale agreement identified the "buyer" as Torrance "or his designee." RWT subsequently became the designee under the agreements. Thus, title to each property was transferred to RWT by limited warranty deed in February 2015.

{¶ 7} The investment properties were advertised on a website, www.investorincomeproperties.com, which was "employed by defendant[s] Assets Unlimited, IIP Ohio, and other limited liability companies that Davor Rom owned, directly or indirectly." The properties were marketed as "hands-free, turnkey, renovated, fully-tenanted, and professionally managed to produce net returns of investment greater than 18%." The "mission statement" displayed on the website promised "a comprehensive process for the acquisition, stabilization, management, and performance of investment properties with 10-20% return on investment." "Our team," the website declared, "handles the entire purchase and management process, providing an essentially automated stream of income and increased [return on investment] levels delivered hands-free and turnkey to [Investor Income Properties] clients."

{¶ 8} On February 16, 2015, RWT entered into separate property-management agreements with IIPM for the Greenhurst and Corkhill properties. On February 27, 2015, RWT entered into a third property-management agreement with IIPM for the Beachview property. Each property-management agreement identified RWT as the property "owner." The agreements required IIPM to provide property management services for each property. In exchange, RWT was required to pay IIPM management fees and 10 percent of gross collected rents. The agreements were signed by Torrance in his capacity as the owner of RWT.

{¶ 9} Having received substantially less return on the investments than had been "promised, assured, or otherwise represented," Torrance and RWT filed a civil

complaint against the defendants on July 5, 2018. In general, the complaint alleged that, through a series of misrepresentations or concealments, Torrance was fraudulently induced to (1) create RWT, (2) purchase the subject properties, and (3) enter into the property-management agreements with IIPM.

{¶ 10} The complaint asserted causes of action for fraudulent inducement of the purchase and sale agreements (Count 1), negligent misrepresentation of the purchase and sale agreements (Count 2), fraudulent inducement of the property-management agreements (Count 3), negligent misrepresentation of the property-management agreements (Count 4), breach of the property-management agreements (Count 5), breach of fiduciary duty (Count 6), violations of the ODTPA (Count 7), and civil conspiracy (Count 8). Relevant to this appeal, the appellees were only named in Counts 5, 6, 7, and 8 of the complaint.

{¶ 11} As stated, Torrance sold his interest in RWT to a third party in April 2017. By September 2018, RWT voluntarily dismissed all claims against the defendants with prejudice. Accordingly, Torrance filed an amended complaint, raising the same causes of action against the defendants in his individual capacity.

{¶ 12} On January 4, 2019, IIPM and Varenkova filed a joint motion for judgment on the pleadings pursuant to Civ.R. 12(C). The appellees argued that Torrance does not have standing to assert claims arising from the property-management agreements entered into between RWT and IIPM because Torrance was not a party to the agreements. Alternatively, the appellees argued that Torrance's claims were barred by res judicata because RWT dismissed all of its

claims against each defendant with prejudice, resulting in a final judgment on the merits.

{¶ 13} On February 4, 2019, Torrance filed a brief in opposition, arguing that he has standing to pursue the claims against the appellees because he has a personal stake in the outcome of the claims. He noted that he invested $48,630 of his own money and assumed an additional $118,170 in debt to purchase the subject properties. In addition, Torrance argued that he is a third-party beneficiary under the property-management agreements with IIPM.

{¶ 14} On February 6, 2019, Torrance sought leave of court to file a second amended complaint. On February 22, 2019, the trial court issued an order adopting the parties' stipulation that the appellees' motion for judgment on the pleadings would apply to a second amended complaint that Torrance intended to file. On February 28, 2019, Torrance filed a second amended complaint, setting forth the same causes of action against the defendants.

{¶ 15} In an opinion and order dated March 25, 2019, the trial court granted the appellees' motion and dismissed all counts pertaining to IIPM and Varenkova. The trial court determined that Torrance lacked standing to pursue the claims against IIPM and Varenkova because he was neither a party to, nor a beneficiary of, the property-management agreements between RWT and IIPM. The court stated, in relevant part:

> Having chosen to do business as a corporation, [Torrance] is bound by that choice. RTW was a party to the property-management agreements, [Torrance] was not. [Torrance] has cited no case law

suggesting that an owner of a corporation is therefore an intended third-party beneficiary. [Torrance] signed and is referenced only as the corporate owner, not as an individual. The plain language of the contract reveals all contractual obligations are owed to RWT. No contractual duties were owed to [Torrance] separate and apart from those owed to RWT. [Torrance] sold RWT, and RWT has dismissed its claims with prejudice. [Torrence] has no standing to pursue these claims on his own individual behalf.

All allegations of in the complaint relating to IIP Management, L.L.C. and Violetta Varenkova relate to the property-management agreements entered into by RWT and therefore all claims against these defendants are dismissed.

**{¶ 16}** Codefendants Davor, Daniel, Halsall, and their various real estate companies filed separate motions to dismiss pursuant to Civ.R. 12. These motions were addressed in the trial court's March 25, 2019 judgment entry. As to these codefendants, the trial court dismissed Counts 3, 4, 5, and 6. However, the trial court determined that it was premature to dismiss Counts 1, 2, 7, and 8 against these codefendants. Accordingly, portions of Torrance's complaint remain pending against the codefendants.

**{¶ 17}** Torrance now appeals from the trial court's judgment dismissing all claims against IIPM and Varenkova.

## II. Law and Analysis

**{¶ 18}** In his sole assignment of error, Torrance argues that the trial court erred in dismissing his complaint pursuant to Civ.R. 12(C).

**{¶ 19}** We review a ruling on a motion for judgment on the pleadings de novo. *Coleman v. Beachwood*, 8th Dist. Cuyahoga No. 92399, 2009-Ohio-5560,

¶ 15. Motions for judgment on the pleadings are governed by Civ.R. 12(C), which states:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings.

{¶ 20} Unlike a motion for summary judgment where the parties are permitted to submit certain evidentiary materials for the court's review, the determination of a motion for judgment on the pleadings is restricted solely to the allegations in the pleadings and any writings attached to the complaint. *Peterson v. Teodosio*, 34 Ohio St.2d 161, 165-166, 297 N.E.2d 113 (1973). Civ.R. 12(C) requires a determination that no material factual issues exist and that the movant is entitled to judgment as a matter of law. *Burnside v. Leimbach*, 71 Ohio App.3d 399, 403, 594 N.E.2d 60 (10th Dist.1991).

{¶ 21} Under Civ.R. 12(C), dismissal is appropriate where a court (1) construes the material allegations in the complaint, with all reasonable inferences to be drawn therefrom, in favor of the nonmoving party as true, and (2) finds beyond doubt, that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *State ex rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 570, 664 N.E.2d 931 (1996). Thus, the granting of judgment on the pleadings is only appropriate where the plaintiff has failed to allege a set of facts that, if true, would establish the defendant's liability. *Chromik v. Kaiser Permanente*, 8th Dist. Cuyahoga No. 89088, 2007-Ohio-5856, ¶ 8, citing *Walters v. First Natl. Bank of Newark,* 69 Ohio St.2d 677, 433 N.E.2d 608 (1982).

## A. Standing

{¶ 22} In this case, the appellees' motion for judgment on the pleadings was predicated on their position that Torrance lacked standing to pursue claims against them because he was not a party to the underlying property-management agreements.

{¶ 23} "Standing" is defined as "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, ¶ 27, citing *Black's Law Dictionary* 1442 (8th Ed.2004). A party must establish standing to sue before a court can consider the merits of a legal claim. *Ohio Contrs. Assn. v. Bicking*, 71 Ohio St.3d 318, 320, 643 N.E.2d 1088 (1994). "To have standing, a party must have a personal stake in the outcome of a legal controversy with an adversary." *Kincaid v. Erie Ins. Co.*, 128 Ohio St.3d 322, 2010-Ohio-6036, 944 N.E.2d 207, ¶ 9, citing *Pyro* at ¶ 27. The lack of standing may require a court to dismiss an action. *Thies v. Wheelock*, 2017-Ohio-8605, 100 N.E.3d 903, ¶ 10 (2d Dist.).

{¶ 24} Thus, in order for Torrance to establish standing, he must show he suffered "(1) an injury that is (2) fairly traceable to the appellees' allegedly unlawful conduct, and (3) likely to be redressed by the requested relief." *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, ¶ 22, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). These three factors comprise the constitutional minimum for standing. *Lujan* at 560. Finally, "[i]t is well settled that standing does not depend on the

merits of the plaintiff's contention that particular conduct is illegal or unconstitutional. Rather, standing turns on the nature and source of the claim asserted by the plaintiff." *Moore* at ¶ 23, citing *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

{¶ 25} As stated, Torrance's second amended complaint asserted causes of action against the appellees for breach of the property-management agreements, breach of fiduciary duty, violations of the ODTPA, and civil conspiracy. We now address Torrance's standing to pursue each of these claims against the appellees.

### 1. Breach of the Property-Management Agreements and Breach of Fiduciary Duty

{¶ 26} In this case, Counts 5 and 6 of the second amended complaint allege claims for breach of contract and breach of fiduciary duty. The claims relate to the contractual obligations and fiduciary duties that arose from the property-management agreements between RWT and IIPM.

{¶ 27} Specifically, Count 5 of the complaint alleged that:

IIP Management breached each of the three property-management agreements * * * by (a) quoting a $500 eviction charge when the agreements established a $300 charge, (b) charging a mark-fee for maintenance performed in-house, (c) delaying credits to the account, (d) charging Torrance for late fees, (e) performing repairs in excess of $300 without notifying or obtaining authorization from Torrance.

{¶ 28} In turn, Count 6 of the complaint alleged, in relevant part:

IIP Management owed Plaintiff RWT a fiduciary duty to use its best efforts to further the interest of Plaintiff RWT by doing all of the following and more: (a) exercising reasonable skill and care in representing the client and carrying out the responsibilities of the agency relationship; (b) performing the terms of any written the

property-management agreements; (c) following the lawful instructions of Plaintiff RWT; (d) disclosing to Plaintiff RWT any material facts of the transaction of which IIP Management was aware or should have been aware in the exercise of reasonable skill and care; (e) timely accounting for all moneys received; and (f) providing Plaintiff RWT with truthful and accurate information.

IIP Management breached its fiduciary duty to Torrance by, inter alia, (a) failing to inform him of (i) tenant arrearages, (ii) tenant complaints, and (iii) unauthorized agreement to forgive tenant debts; (b) failing to provide promises reinspection reports for Greenhurst and Corkhill; (c) agreeing to forgive tenant debts without authority; (d) failing to secure authorization from him for repairs and/or maintenance tasks in excess of $300; (e) charging him (i) a mark-up fee for repairs and/or maintenance performed by in-house maintenance personnel, (ii) expenses which were to be borne solely by IIP Management, and (iii) exorbitant rates for maintenance and other items; (f) tardily crediting the account with disbursements; and (g) more.

{¶ 29} To succeed on a breach of contract claim, a plaintiff must show "the existence of a binding contract or agreement; the non-breaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the non-breaching party suffered damages as a result of the breach." *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (8th Dist.1995).

{¶ 30} To maintain a claim for breach of a fiduciary duty, the plaintiff must prove (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury proximately resulting from that failure. *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988); *Harwood v. Pappas & Assocs.*, 8th Dist. Cuyahoga No. 84761, 2005-Ohio-2442, ¶ 26.

A fiduciary has been defined as a person having a duty, created by his or her undertaking, to act primarily for the benefit of another in matters connected with such undertaking. *Strock*, 38 Ohio St.3d 207, 527

N.E.2d 1235 (1988). A claim of breach of fiduciary duty is basically a claim for negligence that involves a higher standard of care. *Id.*

*All Star Land Title Agency, Inc. v. Surewin Invest., Inc.*, 8th Dist. Cuyahoga No. 87569, 2006-Ohio-5729, ¶ 36.

{¶ 31} On appeal, Torrance argues he "has standing to prosecute his claims for breach of the management agreements and breach of fiduciary duty." He contends that it can reasonably be inferred from the circumstances surrounding the creation of the property-management agreements that he was an intended third-party beneficiary, and therefore, acquired rights under the contract as well as the ability to enforce the contract once those rights vested. Torrance notes that he personally financed the purchase of each property and that RWT was a "disregarded entity" under Ohio and federal law.

{¶ 32} Only an intended third-party beneficiary has enforceable rights under a contract to which he or she is not a party; an incidental third-party beneficiary does not. *TRINOVA Corp. v. Pilkington Bros., P.L.C.,* 70 Ohio St.3d 271, 277, 638 N.E.2d 572 (1994); *see also Grant Thornton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161, 566 N.E.2d 1220 (1991) ("Only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio."). In *Hill v. Sonitrol of S.W. Ohio, Inc.*, 36 Ohio St.3d 36, 40, 521 N.E.2d 780 (1988), the Ohio Supreme Court adopted Section 302 of the Restatement of the Law 2d, Contracts (1981), regarding intended and incidental third-party beneficiaries. That section provides:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Id.* at 39-40.

{¶ 33} Comment e to Section 302 states:

Performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary as here defined, no duty to him is created. * * *

*Id.*

{¶ 34} For a third party to be an intended beneficiary of a contract under Ohio law, "there must be evidence that the contract was intended to directly benefit that third party." *Huff v. FirstEnergy Corp.*, 130 Ohio St.3d 196, 2011-Ohio-5083, 957 N.E.2d 3, ¶ 12; *see also Koster v. Mohammed Chowdhury*, 8th Dist. Cuyahoga No. 103489, 2016-Ohio-5704, ¶ 8 ("In order for a third person to enforce a promise made for that person's benefit, it must appear that the contract was made and entered into directly or primarily for the benefit of such third person.").

{¶ 35} Ohio courts apply an "intent to benefit" test in determining whether a third party is an intended or incidental beneficiary:

"Under this analysis, if the promisee * * * intends that a third party should benefit from the contract, then that third party is an 'intended

> beneficiary' who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an 'incidental beneficiary,' who has no enforceable rights under the contract.
>
> * * * [T]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary."

*Hill*, 36 Ohio St.3d 36, at 40, 521 N.E.2d 780, quoting *Norfolk & W. Co. v. United States,* 641 F.2d 1201, 1208 (6th Cir.1980); *see also TRINOVA,* 70 Ohio St.3d 271, at 277-278, 638 N.E.2d 572 (Under the intent-to-benefit test, "there must be evidence, on the part of the promisee, that he intended to directly benefit a third party, and not simply that some incidental benefit was conferred on an unrelated party by the promisee's actions under the contract. There must be evidence that the promisee assumed a duty to the third party.").

{¶ 36} "Generally, the parties' intention to benefit a third party will be found in the language of the agreement." *Huff* at ¶ 12, 22 ("[F]or an injured third party to qualify as an intended third-party beneficiary under a written contract, the contract must indicate an intention to benefit that third party."); *see also Meinert Plumbing v. Warner Indus.*, 2017-Ohio-8863, 90 N.E.3d 966, ¶ 54 (8th Dist.). Although there is no requirement that the intended third-party beneficiary be expressly identified in the contract, the contract must be shown to have been made and entered into with the intent to benefit that individual. *See, e.g., Heintschel v. Montgomery*, 6th Dist. Lucas No. L-10-1060, 2010-Ohio-6519, ¶ 30; *Bungard v. Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 07AP-447, 2007-Ohio-6280, ¶ 23.

{¶ 37} After careful review, we find the property-management agreements in this case do not indicate an intention to benefit Torrance in his personal capacity. The terms and conditions of each agreement do not contain language establishing a direct benefit to Torrance on behalf of either RWT or IIPM. In fact, the agreements do not reference Torrance or his interests in RWT. Rather, each property-management agreement unambiguously provides that the mutual promises set forth in the contracts were made between RWT, the property "owner," and IIPM, the property "manager." Torrance is not a party to the agreements.

{¶ 38} Moreover, even if this court were to consider circumstances beyond the four corners of the contracts, we find nothing in the pleadings to suggest that either RWT or IIPM intended to give Torrance the benefit of the promised performance. *See* Restatement of the Law 2d, Contracts, Section 302(1)(b) (1981). Contrary to his position on appeal, Torrance does not have standing to sue on RWT's behalf simply because he was financially affected by income and expenses of RWT. In advancing his arguments, Torrance has failed to account for the fact that he elected to conduct his business through a limited liability company. A limited liability company, such as RWT, exists as an entity separate from its members and is capable of suing and of being sued. *Trickett v. Masi*, 11th Dist. Portage No. 2018-P-0006, 2018-Ohio-4270, ¶ 19, citing *Disciplinary Counsel v. Kafele*, 108 Ohio St.3d 283, 2006-Ohio-904, 843 N.E.2d 169, ¶ 18; *Cleveland Bar Assn. v. Pearlman*, 106 Ohio St.3d 136, 2005-Ohio-4107, 832 N.E.2d 1193, ¶ 36 (O'Donnell, J., dissenting); *Ogle v. Hocking Cty.*, 4th Dist. Hocking No. 14CA3, 2014-Ohio-5422, ¶

25. "Thus, members of a limited liability company, even if they are the sole members of the company, do not have standing to sue on its behalf." *Id.*, citing *Ogle*. *See also Estep v. Xanterra Kingsmill, L.L.C.*, E.D. Va. No. 4:16-cv-89, 2017 U.S. Dist. LEXIS 43706, 3-4 (Mar. 20, 2017), citing *Matthews v. HSBC Bank USA*, E.D. Va. No. 1:14cv810, 2014 U.S. Dist. LEXIS 189931 (July 25, 2014) ("Even if [the sole and managing member of an L.L.C.] has suffered personal damage as a consequence of any damage to [the L.L.C.], he has no standing to state a claim for those damages" in his individual capacity) (citations omitted); *Orgain v. Salisbury*, 521 F.Supp.2d 465, 476, fn. 33 (D.Md. 2007) ("Shareholders (or in the case of an L.L.C., its members) do not have standing to sue on the corporation's behalf.") (citations omitted). Moreover, "the requirement that a [limited liability company] be treated as a separate legal entity applies regardless of the income tax treatment elected by the L.L.C.'s member(s)." *Estep* at 4. Thus, the designation of RWT as a disregarded entity does not provide Torrance standing in this matter.

{¶ 39} Because limited liability companies are treated as separate entities, there is no basis to conclude that Torrance, in his personal capacity, was an intended third party beneficiary. Any damages sustained as a result of the appellees' alleged breach of the subject agreements were exclusively owed to RWT — the designated "owner" of each property. To the extent Torrance was indirectly harmed by the breach, the harms caused to Torrance and RWT would be identical or duplicative, "and any claim must be filed by the [company] itself." *Eppich v. Nureddin*, 8th Dist. Cuyahoga No. 95788, 2011-Ohio-2407, ¶ 16. Here, RWT ultimately dismissed all

claims against the defendants with prejudice. Under these circumstances, we find Torrance was merely an incidental beneficiary, who has no enforceable rights under the contract.

{¶ 40} Similarly, we find Torrance lacked standing to pursue a breach of fiduciary duty claim against the appellees. As set forth above, Torrance did not share a commercial or contractual relationship with the appellees in his personal capacity. Because the pleadings do not set forth the existence of a duty arising from a fiduciary relationship, Torrance cannot show he suffered an injury that is fairly traceable to the appellees' alleged conduct.

{¶ 41} Accordingly, we find the trial court did not err in dismissing Counts 5 and 6 based on Torrance's lack of standing to pursue the claims against the appellees.

## 2. Equitable Estoppel

{¶ 42} In an effort to avoid the implications of standing, Torrance briefly argues that the appellees "should be estopped from asserting their standing defense." As stated by this court:

> "The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice." *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145, 555 N.E.2d 630 (1990), citing *Heckler v. Community Health Servs.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Lex Mayers Chevrolet Co. v. Buckeye Fin. Co.*, 107 Ohio App. 235, 153 N.E.2d 454 (10th Dist.1958), aff'd, 169 Ohio St. 181, 158 N.E.2d 360 (1959). The party claiming estoppel "'must demonstrate: (1) that the defendant made a factual misrepresentation; (2) that is misleading; (3) that induces actual reliance which is reasonable and in good faith; and (4) which causes detriment to the relying party.'" *Clark v. Univ. Hosps. of Cleveland*, 8th Dist. Cuyahoga No. 78854, 2001 Ohio

App. LEXIS 3832, 14-15 (Aug. 30, 2001), quoting *Livingston v. Diocese of Cleveland*, 126 Ohio App.3d 299, 710 N.E.2d 330 (8th Dist.1998).

*N. Frozen Foods, Inc. v. Farro*, 8th Dist. Cuyahoga Nos. 108269 and 108466, 2019-Ohio-5344, ¶ 25. Relevant to this appeal, the doctrine of equitable estoppel may be "used to bar a party from raising a defense or objection it otherwise would have[.]" *Holt Co. v. Ohio Mach. Co.*, 10th Dist. Franklin No. 06-AP-911, 2007-Ohio-5557, ¶ 28. The doctrine is a shield, not a sword. *Id.*

{¶ 43} On appeal, Torrance contends that the doctrine of equitable estoppel should prohibit the appellees from "differentiating between [himself] and RWT" because "RWT was only created solely at the behest of [defendants] Davor Rom and Halsall." Torrance asserts that "had he not been induced * * * to invest in Cleveland area properties, [he] never would have consented to the creation of RWT or otherwise been involved in the formation of the limited liability company in Ohio."

{¶ 44} We find no merit to Torrance's position. Without addressing whether Torrance was required to assert a claim for estoppel in the pleadings,[1] we find no factual allegation in the second amended complaint to suggest the appellees made a factual misrepresentation that induced Torrance to create RWT. Thus, as it pertains to the creation of RWT, Torrance has failed to provide any basis to conclude that the appellees induced him to change his position in good faith. The doctrine of equitable estoppel is inapplicable against the appellees in this instance.

---

[1] *See Globe Indemn. Co. v. Wassman*, 120 Ohio St. 72, 87, 165 N.E. 579 (1929) ("This court has established the principle that, in order to avail himself of proof of a waiver, or estoppel, a plaintiff, having opportunity to do so, must allege in his pleadings facts invoking that equitable relief.").

### 3. Ohio Deceptive Trade Practices Act

{¶ 45} Count 7 of the complaint set forth a cause of action for violations of the ODTPA. Specifically, the complaint alleged as follows:

> Varenkova [and] * * * IIP Management * * * violated the Ohio Deceptive Trade Practices Act ("ODTPA"), R.C. 4165.01, et seq., by, inter alia, (a) causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services, (b) causing likelihood of confusion or misunderstanding as to affiliation, connection or association with or certification by, another, (c) representing that good or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have, (d) advertising goods or services with intent not to sell them as advertised, and/or (e) making false statements of fact concerning the reasons for, existence of, or amounts of price reductions.

{¶ 46} Ohio courts construe the ODTPA, R.C. 4165.01 to 4165.04, consistent with authority under comparable federal statutes. *Cesare v. Work*, 36 Ohio App.3d 26, 28, 520 N.E.2d 586 (9th Dist.1987). R.C. 4165.02 governs deceptive trade practices and lists numerous ways one can engage in such a practice. The statute provides, in relevant part:

> A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:
>
> * * *
>
> (2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;
>
> * * *

(7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

* * *

(11) Advertises goods or services with intent not to sell them as advertised;

(12) Makes false statements of fact concerning the reasons for, existence of, or amounts of price reductions[.]

{¶ 47} The ODTPA gives standing to bring a civil action to a "person who is likely to be damaged by a person who commits a deceptive trade practice" or a "person who is injured by a person who commits a deceptive trade practice." R.C. 4165.03(A)(1)-(2). A plaintiff seeking injunctive relief under R.C. 4165.02(A)(1) need only demonstrate that he or she is likely to be damaged by the person who commits the allegedly deceptive trade practice. However, a plaintiff seeking damages under R.C. 4165.03(A)(2) may only "recover actual damages." In this case, Torrance sought only monetary damages for his ODTPA claim and not injunctive relief. Accordingly, R.C. 4165.03(A)(2) governs our review.

{¶ 48} Applying R.C. 4165.02 and 4165.03, the elements necessary for an ODTPA claim have been described as (1) a false statement or statement that is misleading, (2) which statement actually deceived or has the tendency to deceive a substantial segment of the target audience, (3) the deception is material in that it is likely to influence a purchasing decision, and (4) the plaintiff has been or is likely to be injured as a result. *See Strama v. Allstate Ins.*, 7th Dist. Belmont No. 14 BE

8, 2015-Ohio-2590, ¶ 47, citing *Craven v. Aultman College of Nursing & Health Sciences*, 4th Dist. Stark No. 2011-CA-00022, 2011-Ohio-4974, ¶ 42.

{¶ 49} The ODTPA defines a "person" as "an individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, limited liability company, two or more of any of the foregoing having a joint or common interest, or any other legal or commercial entity." R.C. 4165.01(D).

{¶ 50} Relevant to this case, the definition of "person" in the ODTPA qualifies the list of individuals and entities permitted to sue with the phrase "or any other legal or commercial entity." This phrase implies that an individual may bring suit under the ODTPA in his or her "capacity as a participant in commercial activity," but may not bring suit as a noncommercial consumer. *Gascho v. Global Fitness Holdings, L.L.C.*, 863 F.Supp.2d 677, 698 (S.D.Ohio 2012). Thus, this court has recognized that individual consumers are barred from bringing actions under R.C. Chapter 4165. *Michelson v. Volkswagen Aktiengesellschaft*, 2018-Ohio-1303, 99 N.E.3d 475, 479 (8th Dist.2018); *Dawson v. Blockbuster, Inc.*, 8th Dist. Cuyahoga No. 86451, 2006-Ohio-1240, ¶ 23-25.

{¶ 51} On appeal, Torrance argues that he, as a "person," has standing to pursue an ODTPA claim against the appellees for deceptive trade practices because IIPM and Varenkova are each "persons" who are "engaged in a business, vocation, or occupation." In contrast, the appellees argue that Torrance lacked standing to pursue a claim under the ODTPA because "Torrance never had a relationship

(commercial, contractual, business, or otherwise) with IIPM or its alleged employee, Varenkova." The appellees contend that "whatever IIPM and Varenkova allegedly did to violate the ODTPA, they did to RWT — not Torrance."

{¶ 52} To the extent Torrance's ODTPA claim relies on the circumstances that influenced RWT's decision to execute the property-management agreements, we agree that Torrance does not have standing to pursue a claim on these grounds. Torrance was not a party to the property-management agreements, and therefore, has no personal stake in any legal claims that might arise from the agreements. Any injury and resulting damages would have been suffered by RWT, the designated owner of each property.

{¶ 53} However, this does not end our inquiry. While the pleadings demonstrate that Torrance was not a party to the property-management agreements entered into between the appellees and RWT, a "formal relationship" is not a prerequisite to recovery under R.C. 4165.02 and 4165.03. *Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 81 Ohio App.3d 591, 599, 611 N.E.2d 955 (9th Dist.1992). To warrant "actual damages," the plaintiff-person need only establish an injury that was proximately caused by a person who commits a deceptive trade practice that is listed under R.C. 4165.02. *Id.* There is no language in the statute to suggest a contractual relationship is necessary. *Id.* ("Since this enactment is unequivocal in this respect, it may not be construed in any manner other than what its plain terms indicate."). Thus, while Torrance lacks standing to pursue a ODPTA claim that is predicated on the execution of property-management agreements, he

is not entirely prevented from pursuing a claim against the appellees on other grounds merely because they did not share a contractual relationship.

{¶ 54} In this case, the pleadings reflect that prior to the creation of RWT, Torrance personally executed the purchase and sale agreements for the investment properties. He invested money from his personal accounts with the commercial intent of producing revenue. The appellees correctly note that this court has held "that individual consumers are barred from bringing actions * * * under Ohio's Deceptive Trade Practices Act, R.C. 4165, et seq." *Michelson*, 2018-Ohio-1303, 99 N.E.3d 475, at ¶ 16; *Dawson*, 8th Dist. Cuyahoga No. 86451, 2006-Ohio-1240, at ¶ 24-25. In this case, however, Torrance's initial investment was a purely commercial endeavor, and not a consumer transaction. *Rui He v. Rom*, N.D. Ohio No. 15-cv-1869, 2016 U.S. Dist. LEXIS 137183, 10-11 (Oct. 3, 2016) (finding a real estate investor had standing to pursue an ODTPA claim under analogous circumstances). Thus, we find Torrance was a "person" as contemplated under R.C. Chapter 4165 et seq.

{¶ 55} Given the commercial nature of his endeavor, Torrance has standing to pursue a claim under the ODTPA based on allegations that the appellees' deceptive trade practices influenced his initial decision to personally invest in the Greenhurst, Corkhill, and Beachview properties. Such a claim involves actual damages sustained by Torrance individually, is independent of the property-management agreements, and relates to representations made to Torrance prior to the creation of RWT.

{¶ 56} Regarding the factual allegations supporting his ODTPA claim against the appellees, we note that "under the notice pleading requirements of Civ.R. 8(A)(1), the plaintiff is only required to plead sufficient, operative facts to support recovery under her claims." *Moncrief v. Bohn*, 2014-Ohio-837, 9 N.E.3d 508, ¶ 22 (8th Dist.). A well-pled complaint must include factual allegations going to each element of the claim, and conclusory statements without any factual allegations in support are insufficient. *Hendrickson v. Haven Place, Inc.*, 8th Dist. Cuyahoga No. 100816, 2014-Ohio-3726, ¶ 27.

{¶ 57} In this case, the second amended complaint alleges that, in addition to the numerous real estate companies displaying "the 'IIP' moniker," codefendant "Davor Rom and others" organized IIPM in June 2013. The complaint further alleges that Davor's wife, appellee Varenkova, serves as the director of operations for IIPM. Regarding Torrance's ODTPA claim, the complaint alleges that his decision to invest in Cleveland-area properties was predicated on misleading statements, including certain representations made on a marketing website that was "employed by Assets Unlimited, IIP Ohio, and other limited-liability companies that Davor Rom owned, directly or indirectly." Regarding this website, the second amended complaint alleges as follows:

> 40. The marketing posted on the website www.investorincomeproperties.com prominently featured an organizational diagram which displayed IIP on the top line, ICR and several other companies on the second line, and IIP Management * * * on the third line. The marketing described * * * IIP Marketing as 'in – house, full property management[.]

41. The marketing promoted the "develop[ment of] the assets and expertise needed to bring short-term returns of 10 to 20 percent annual cash-on-cash return." "Our team," it declared, "handles the entire purchase and management process, providing an essentially automated stream of income and increased ROI levels delivered hands-free and turnkey to IIP clients."

42. The marketing contained a "Mission Statement," which read:

Creation of value-added and turnkey assets in opportunistic markets at a fraction of their peak-values. Delivering a comprehensive process for the acquisition, stabilization, management and performance of investment properties with 10-20% ROI, while delivering a true hands-off experience for the global investor community.

43. The marketing highlighted (a) "Short-term 10-20% ROI in the form of monthly Cash-flow from rental properties," (b) "Investment opportunities for both beginning real-estate investors and established investors," and (c) "Complete processing and management of turnkey properties for clients located globally" as "a few of the benefits IIP brings to the world of real estate investment."

44. Declaring that "[o]ur global clientele enjoy the opportunity of investing in US real estate without any of the hassle," the marketing identified "[t]he priority of Investor Income Properties [a]s [the] development of turnkey US properties that offer a high reward investment with little to no drawback." "We manage everything from acquisition of real estate to management of the property for short-term profitability," it declared further, while adding that "[w]e focus on acquisition, value-added renovations, development in and around urban areas in Ohio. Properties provide 10 to 20 percent short-term ROI with significant long-term appreciation opportunity."

45. Under the heading "IIP Property Management," the marketing declared that the "IIP team manages every aspect of real estate investment for each of our global clients," and assured prospective clients that "[n]o matter where you live, work, and play, our team of professionals makes it possible for you to invest in high-return US real estate. We focus on not only the acquisition of properties, but also on value-added renovations, portfolio development and growth of assets with excellent ROI." Continuing, the marketing promoted "our management division," that "utilizes industry management software, which allows our clients a log-in portal where they can view all matters relating to their investment real estate at their convenience and at any

times," and emphasized that "[a]s our clients are global, IIP Management leaves no stone unturned when it comes to management of your investment property."

(Second Amended Complaint at ¶ 40-45.)

{¶ 58} As set forth in the foregoing allegations of fact, Torrance's second amended complaint asserts that IIPM held itself out to be part of the "IIP team," that would provide international investors with a hands-off experience that would lead to high returns on investment. In facilitating these high returns, IIPM represented that it efficiently and professionally manages each aspect of the real estate investment to ensure "an essentially automated stream of income." Additional representations about the quality and professionalism of the IIP team's "own management company" were made to Torrance prior to the purchase of the investment properties. (*Id.* at ¶ 48-50, 56, 63.)

{¶ 59} Relying on the foregoing assurances and representations, "Torrance invested a total of $166,800 by (a) withdrawing $48,630 from his savings, and (b) borrowing (i) $105,170 from Peak Equity Group, L.L.C., and (ii) $13,000 from ICR." Thus, the complaint suggests that Torrance's investment prior to the creation of RWT was inextricably linked to the appellees' representations of its management services. Despite the representations of IIPM's services, however, the second amended complaint alleges that:

92. IIP Management lacked trained, certified maintenance workers. It lacked systems, policies and/or procedures. It lacked credit with which to purchase materials. Instead, IIP Management (a) employed workers who had their own, separate businesses, which they ran while being paid to perform IIP Management work, and (b) allowed contractors to

define their own scopes of work. As a result, Torrance and many other investors and tenants were disgruntled with IIP Management.

93. IIP Management provided unaudited and inaccurate account statements to Torrance, thereby requiring him to expend significant amounts of time to determine the status of the properties.

94. IIP Management regularly and continuously either evaded or refused to answer questions asked by Torrance regarding the properties and the tenants.

95. IIP Management routinely offered false and/or unsupported excuses for its property management deficiencies.

(*Id.* at ¶ 92-95.)

{¶ 60} The second amended complaint further asserts that Varenkova "participated in, directed, encouraged and/or acquiesced in the malmanagement, mismanagement and/or non-management of IIPM." (*Id.* at ¶ 107.) And, due to the IIP teams' failure to comport with their representations and assurances, Torrance alleged that he "received substantially less return on [his] investment than had been promised, assured, or otherwise represented to [him]." (*Id.* at ¶ 108.)

{¶ 61} Construing the second amended complaint and all reasonable inferences in Torrance's favor, we find Torrance has presented sufficient factual allegations to suggest he was induced to invest in Ohio real estate based on the appellees' misrepresentations that, if accepted as true, would violate the ODTPA. The second amended complaint also contains sufficient factual allegations of damages, as Torrance states that the false or misleading representations about the "IIP teams" property management services influenced his decision to invest personal monies in Cleveland-area real estate prior to the creation of RWT. *See*

*Rom*, N.D. Ohio No. 15-cv-1869, 2016 U.S. Dist. LEXIS 137183, at 6-9 (Oct. 3, 2016) (finding remaining issues of material fact as to whether the double digit returns representations were material representations, and whether IIPM's management services were material to Torrance's decision to invest).

{¶ 62} Accordingly, we find the trial court erred by dismissing Count 7 against the appellees.

### 4. Civil Conspiracy

{¶ 63} Finally, Count 8 of the complaint alleged, in relevant part:

> Defendants conspired, inter alia, (a) to fraudulently induce Torrance to purchase the three properties, (b) to violate the ODPTA; (c) to fraudulently induce them to enter into the property-management agreements with IIP Management, and (d) to breach the obligations of IIP Management under those agreements and Ohio law.

{¶ 64} The tort of civil conspiracy has been defined as a "malicious combination of two or more persons to injure another, in person or property, in a way not competent for one alone." *Minarik v. Nagy*, 8 Ohio App.2d 194, 196, 193 N.E.2d 280 (8th Dist.1963). The malice portion of the tort is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Gosden v. Louis*, 116 Ohio App.3d 195, 219, 687 N.E.2d 481 (9th Dist.1996).

{¶ 65} Pursuant to Ohio law, a civil conspiracy claim standing alone cannot be the subject of a civil action. *Nosker v. Greene Cty. Regional Airport Auth.,* 2d Dist. Greene No. 96 CA 101, 1997 Ohio App. LEXIS 2183 (May 23, 1997), unreported, citations omitted. "The general rule is that a conspiracy cannot be made the subject

of a civil action unless something is done which, without the conspiracy, would give a right of action." *Minarik* at 195. Instead, it must be coupled with another independent cause of action. *Palmer v. Westmeyer*, 48 Ohio App.3d 296, 301, 549 N.E.2d 1202 (6th Dist.1988).

{¶ 66} Thus, the elements that comprise a claim of civil conspiracy are (1) a malicious combination, (2) two or more persons, (3) injury to person or property, and (4) existence of an unlawful act independent from the actual conspiracy. *Laughner v. Laughner*, 8th Dist. Cuyahoga No. 56491, 1990 Ohio App. LEXIS 151 (Jan. 25, 1990).

{¶ 67} On appeal, Torrance argues that "the second amended complaint contains factual allegations from which it can be reasonably inferred that IIPM and Varenkova participated in [a] civil conspiracy" to "violate the ODTPA." In contrast, the appellees reiterate their position that Torrance lacks standing to pursue a conspiracy claim because he "lacked the requisite commercial relationship with IIPM and Ms. Varenkova." The appellees further contend that Torrance failed to allege any facts that Varenkova maliciously participated in a civil conspiracy.

{¶ 68} For the reasons previously discussed, we agree with the trial court's conclusion that Torrance has no standing to pursue a civil conspiracy claim against the appellees' based on the allegations set forth in Counts 1 through 6 of the second amended complaint. With that said, however, we find Torrance has set forth sufficient factual allegations to withstand dismissal on his claim that the appellees conspired with the remaining codefendants to "violate the ODTPA."

{¶ 69} As previously discussed, Torrance's claims for fraudulent inducement of the purchase and sale agreements, negligent misrepresentation of the purchase and sale agreements, violations of the ODTPA, and civil conspiracy are pending against the remaining codefendants. In part, the ODTPA and civil conspiracy claims rely on allegedly false representations made to Torrance prior to the creation of RWT. These purportedly false promises and assurances related to the quality of the investment properties, the professionalism of the management services, and the scope net returns of investment. While the trial court dismissed the ODTPA and civil conspiracy claims against the appellees on the basis of standing, it is evident that Torrance's claims against the appellees rely on similar allegations of fact. Specifically, the complaint asserts that IIPM made representations on the same marketing website that its property management experience and expertise were inextricably linked to the double-digit return on investment opportunities offered by the IIP "team." (*Id.* at ¶ 45.)

{¶ 70} Given the collaborative nature of the personal and business relationships involved in this case, we find the complaint sets forth sufficient allegations that, if accepted as true, the appellees maliciously participated in a conspiracy with the remaining codefendants to injure international investors by making representations that violated the ODTPA. Here, the ODTPA claim underlying the allegation of civil conspiracy alleges, in part, that the management services provided by IIPM were not as represented. Torrance further alleges that Varenkova, together with defendants Halsall, Davor, and Daniel, participated,

directed, or encouraged the mismanagement or nonmanagement of IIPM. The complaint supports these allegations with specific instances of substandard property management services that allow for the reasonable inference that the appellees and their codefendants violated the ODTPA with a shared purpose, which influenced Torrance's decision to invest with the IIP team, and resulted in identifiable damages to Torrance prior to the creation of RWT.

{¶ 71} Accordingly, we find the trial court erred in dismissing the civil conspiracy allegations levied against the appellees as it pertains to their role in the alleged ODTPA violations.

{¶ 72} Based on the foregoing, Torrance's sole assignment of error is sustained in part, and overruled in part. The trial court's dismissal of the breach of contract and breach of fiduciary duty claims against the appellees is affirmed. However, the trial court's dismissal of the ODTPA and civil conspiracy claims is reversed. The matter is remanded to the trial court for further proceedings.

{¶ 73} Judgment affirmed in part, reversed in part, and remanded.

It is ordered that appellees and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGER, ADMINISTRATIVE JUDGE

PATRICIA ANN BLACKMON, J., and
ANITA LASTER MAYS, J., CONCUR