[Cite as *Pierre Invests., Inc. v. CLE Capital Group, Inc.*, 2022-Ohio-4311.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Pierre Investments, Inc.

Court of Appeals No. L-21-1229

    Appellant

Trial Court No. CI0201904258

v.

CLS Capital Group, Inc., et al.

**DECISION AND JUDGMENT**

    Appellees

Decided: December 2, 2022

* * * * *

Joseph W. Westmeyer, III, for appellant.

Zachary J. Murray, for appellees, CLS Capital Group, Inc., Reyanaldo
Uballe, Jr., and Comprehensive Lending Services Capital Group, LLC.

Monica A. Sansalone and Maia E. Jerin, for appellees, Mark Mockensturm,
Brandon Rehkopf, and Mockensturm, Ltd.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from two judgments by the Lucas County Common Pleas

Court partially granting appellees' two motions for summary judgment and, following a

bench trial, a judgment denying appellant's breach of contract claim. For the reasons set forth below, this court affirms the judgments of the trial court.

{¶ 2} Plaintiff-appellant Pierre Investments, Inc. filed this appeal setting forth two assignments of error:

1. After hearing evidence that several other parties were involved in the loan in this case, the trial court improperly dismissed several parties on summary judgment.

2. In spite of the evidence to the contrary, the trial court found in favor [of] the Appellee that he is not liable for the money that he was given when the other party performed their obligations under the agreement.

## I. Background

{¶ 3} On June 16, 2020, appellant sought leave to amend its October 28, 2019 complaint alleging six causes of action against defendants-appellees, CLS Capital Group, Inc. ("CLS"); Reynaldo Uballe, Jr.; Mark Mockensturm; Brandon Rehkopf; and Mockensturm, Ltd., to add one additional defendant-appellee, Comprehensive Lending Services Capital Group, LLC ("Comprehensive"). The trial court granted the motion, and on July 1, 2020, appellant filed an amended complaint alleging the following six causes of action: (1) fraud/misrepresentation by the defendants, (2) third-party legal

2.

malpractice by the Mockensturm Defendants,[1] (3) breach of contract by the CLS Defendants,[2] (4) unjust enrichment by the CLS Defendants, (5) promissory estoppel by the CLS Defendants, (6) and deceptive trade practices[3] by the defendants.

{¶ 4} In summary, appellant, a Texas corporation, through its owner and president, Ken Gazian, alleged it attempted in 2018 to secure $10 million in funding from appellee CLS, "a Delaware corporation doing business in Ohio" of which Mr. Uballe is the owner and president, for a $1.95 million dollar Texas land development project. Appellant alleged a binding funding agreement[4] was reached with CLS, who assigned it to Comprehensive, by paying CLS a loan commitment fee of $75,000.00. Appellant further alleged the Mockensturm Defendants were the attorneys for CLS and were responsible for preparing the documents for the loan closing, which never occurred. As a result of appellees' collective actions, appellant alleged damages from not receiving the loan

---

[1] The label "Mockensturm Defendants" is undefined in the amended complaint, but elsewhere in the record infers Mr. Mockensturm, Mr. Rehkopf, and Mockensturm, Ltd., and we will hereafter collectively refer to them as the "Mockensturm Defendants."

[2] The label "CLS Defendants" is also undefined, but elsewhere in the record infers CLS, Mr. Uballe, and Comprehensive, and we will hereafter collectively refer to them as the "CLS Defendants."

[3] The trial court determined in its September 11, 2020 journalized entry partially granting the Mockensturm Defendants' motion for judgment on the pleadings that appellant's amended complaint count No. 6 was alleged only against the CLS Defendants. Appellant does not appeal that judgment entry.

[4] The agreement is titled, "Loan Commitment (A Line of Credit)," hereafter "Loan Commitment," is dated November 5, 2018, and is signed by Reynaldo Uballe Jr. as President of CLS Capital Group Inc. and Ken Garzian as President/CEO of Pierre Investments Inc.

funds, the loss of the loan commitment fee, and the loss of the Texas land development project opportunity. Appellees generally denied the allegations.

{¶ 5} The CLS Defendants counterclaimed for breach of the contract by appellant for failing to meet the funding conditions, and appellant moved to dismiss the counterclaim.

{¶ 6} Meanwhile, the Mockensturm Defendants[5] and the CLS Defendants[6] separately moved for judgment on the pleadings to dismiss appellant's amended complaint and for sanctions. Appellant opposed the motions. As journalized on September 11, 2020,[7] the trial court partially granted the motion by the Mockensturm Defendants with respect to claim No. 2, third-party legal malpractice.

{¶ 7} Discovery among the parties continued. On December 22, 2020, the Mockensturm Defendants moved for summary judgment on count No. 1, and, over appellant's objections, on March 24, 2021, the trial court granted the motion. On December 30, 2020, the CLS Defendants moved for summary judgment on count Nos. 1, 3, 4, 5 and 6, and, over appellant's objection, on March 24, 2021, the trial court granted the motion for count Nos. 1, 4, 5 and 6 and denied the motion for count No. 3. The trial

---

[5] The Mockensturm Defendants sought dismissal of count Nos. 1 and 2.
[6] The CLS Defendants sought dismissal of count Nos. 1, 3, 4, 5 and 6. The record does not include the trial court's judgment entry for this motion.
[7] The record shows the identical judgment entry was again journalized on October 8, 2020.

court further granted appellant's motion to dismiss Mr. Uballe's counterclaim,[8] but denied appellant's motion to dismiss the counterclaim of CLS and Comprehensive.

{¶ 8} The remaining reciprocal breach of contract claims between appellant and appellees CLS and Comprehensive proceeded to a two-day bench trial. The bench trial commenced on September 20, 2021, in which the trial court heard testimony from three witnesses and admitted 18 exhibits into evidence. After issuing notice pursuant to Evid.R. 201(C) of its intent to take judicial notice that CLS "is no longer in existence and became inoperative and void as of March 1, 2012," to which the parties submitted further briefing, on October 29, 2021, the trial court decided as follows: (1) verdict for Comprehensive on appellant's breach of contract claim; (2) verdict for appellant on Comprehensive's breach of contract counterclaim; (3) dismissal of appellant's breach of contract claim against CLS; and (4) dismissal of CLS' breach of contract counterclaim against appellant. Appellant timely appealed.

## II. Motions for Summary Judgment

{¶ 9} Appellant's first assignment of error challenges the trial court's March 24, 2021 journalized decisions granting, in part, the motions for summary judgment by the

---

[8] Specifically, the trial court ordered on March 24, 2021, "that defendant, Reynaldo Uballe, Jr., is dismissed as a defendant to the remaining Count III of Plaintiff's Amended Complaint."

Mockensturm Defendants on count No. 1, and, separately, by the CLS Defendants on count Nos. 1 and 6.[9]

## A. Standard of Review

{¶ 10} We review de novo a trial court's grant of summary judgment. *Ratonel v. Roetzel & Andress, L.P.A.*, 147 Ohio St.3d 485, 2016-Ohio-8013, 67 N.E.3d 775, ¶ 18. Pursuant to Civ.R. 56(C), summary judgment may be granted under the following three-part test: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the non-moving party, that conclusion is adverse to that party. *Id.* "A 'material' fact is one which would affect the outcome of the suit under the applicable substantive law." *Mike McGarry & Sons, Inc. v. Construction Resources One, LLC*, 2018-Ohio-528, 107 N.E.3d 91, ¶ 57 (6th Dist.). After the summary judgment moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmoving party "produce evidence as to any issue for which that party bears the burden of production at trial." *Dejaiffe v. KeyBank USA Natl. Assn.*, 6th Dist. Lucas No. L-05-1191, 2006-Ohio-2919, ¶ 15.

---

[9] Pursuant to App.R. 12(A)(2) and 16(A)(7), we disregard the first assignment of error with respect to count Nos. 4 (unjust enrichment) and 5 (promissory estoppel) where appellant fails to separately present and argue the trial court's errors for appellate review. *Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Developmental Disabilities*, 102 Ohio St.3d 230, 2004-Ohio-2629, 809 N.E.2d 2, ¶ 18.

## B. Fraudulent Inducement

{¶ 11} Appellant's amended complaint styles count No. 1 as "fraud/misrepresentation" and alleges the following: (1) "Defendants represented CLS was a direct lender and not a third-party broker or financial liaison"; (2) "CLS Defendants guaranteed that the loan was a Guaranteed Loan[10] and not subject to any additional circumstances, conditions, or third-party approvals, and knew [the] statement was false when made"; (3) "Mockensturm Defendants misrepresented the relationship that existed between them and CLS Defendants and fabricated a history of underwriting business"; (4) "All Defendants knew all representations were false, made with intent to deceive, and/or made with such utter disregard as to infer knowledge of defraudment"; (5) "To its detriment, the Plaintiff reasonably relied on Defendants' representations"; and (6) incurred the following damages: (a) "the loss for expected and foreseen profits from the intended real estate development"; (b) "loss of the contract to purchase land subject to lending transaction"; (c) "loss of $97,000 real estate commission paid to Ken Gazian intended for the project use"; (d) "loss of $75,000 commitment fee pledged for the loan"; (e) "loss of use of funds"; and (f) "loss of $10,000 earnest money deposit pledged with the title company."

{¶ 12} Despite appellant's style of count No. 1, the trial court explained in its March 24, 2021 journalized entry why it will analyze count No. 1 as fraud only: "The

---

[10] The label "Guaranteed Loan" is undefined in the amended complaint.

7.

Court notes that Plaintiff's Count 1 for 'fraud/misrepresentation' contains no allegations with respect to a negligence standard and was previously analyzed by this Court [see September 11, 2020 journalized judgment entry] as a claim for fraud, not negligent misrepresentation." Appellant did not appeal the trial court's September 11, 2020 decision dismissing all negligent misrepresentation claims against the Mockensturm Defendants and, specifically, finding: (1) "there is no evidence or allegation to show that either CLS or plaintiff ever retained the Mockensturm [D]efendants in connection with the underlying loan transaction * * * [which] is undisputed that the subject loan was never acquired"; and (2) assuming that any previous unrelated legal work by the Mockensturm Defendants for CLS created a current professional relationship, "there is nothing to suggest that any duty to CLS was breached in connection with the subject loan transaction."

{¶ 13} We will proceed to review appellant's fraud claim, which is more accurately argued by appellant as a fraudulent inducement[11] claim.

A claim of common-law fraud requires proof of the following elements: (a) a representation or, where there is a duty to disclose,

_____

[11] On appeal, appellant argues their claims against appellees for fraud/misrepresentation "are for statements [that] were all false, and were made in order to induce the agreement between the parties and obtain money from" appellant. In addition, the trial court's September 11, 2020 journalized entry stated, "it is important to note that plaintiff's cause of action for fraud deals with communications by the Mockensturm defendants (sic.) that *induced* plaintiff to tender the $75,000 commitment fee." (Emphasis sic.)

8.

concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Mike McGarry & Sons,* 2018-Ohio-528, 107 N.E.3d 91, at ¶ 74; *BAS Broadcasting, Inc. v. Fifth Third Bank*, 2018-Ohio-1324, 110 N.E.3d 171, ¶ 16 (6th Dist.) (appellant's burden of proof of the same six elements are required for a claim of fraudulent inducement).

### 1. The Mockensturm Defendants

{¶ 14} Appellant's fraudulent inducement claim against the Mockensturm Defendants argues they made knowingly false statements to induce appellant to enter into the $10 million Loan Commitment with CLS in order to facilitate CLS to obtain the $75,000 loan commitment fee from appellant. Appellant argues the following are five "manipulative, lying, and deceitful" statements by the Mockensturm Defendants and "issues of fact that were inexplicably left unaddressed" by the trial court's summary judgment decision: (1) that "CLS was a legitimate legal entity who performed numerous lending transactions with Mockensturm"; (2) that "Mockensturm had underwritten documentation for all those loan transactions"; (3) that "CLS Defendants had been clients

9.

of Mockensturm for many years"; (4) that "CLS Defendants were capable of closing the intended transaction for Mr. Garzian"; and (5) that "Mockensturm would be engaged in connection with Mr. Garzian's transaction." We disagree and, upon de novo review, find that appellant failed to identify a genuine issue of material fact ignored by the trial court.

{¶ 15} There are a number of relevant, undisputed facts in the record. Mr. Mockensturm and Mr. Rehkopf are attorneys with the law firm Mockensturm, Ltd. Mr. Gazian testified at his deposition that he sought out and initiated contact with CLS by email because appellant had previously abandoned one or two efforts to qualify for conventional bank financing for the $10 million loan. Prior to approaching CLS for $10 million, only one traditional lender, Compass Bank, now BBVA, has extended a line of credit to Mr. Gazian or his various companies[12] for up to $35,000. Since the CLS deal ended, appellant again abandoned one or two efforts to qualify for financing with lenders.

{¶ 16} Appellant never hired the Mockensturm Defendants to represent it in the funding transaction with CLS, nor to represent it in any prior funding transactions with CLS. The CLS Defendants never hired the Mockensturm Defendants to represent them in the funding transaction with appellant, nor to represent them in prior funding transactions with appellant. The Mockensturm Defendants are neither parties to the Loan Commitment, nor parties to any prior contract with appellant. There is nothing in the

---

[12] Mr. Gazian described appellant Pierre Investments, Inc. as an "umbrella" with various businesses under it, including Devanche Diamonds & Jewelry, which is the only business generating income off of which he lives.

10.

record to indicate the funding transaction between appellant and CLS was not an ordinary, arm's length business transaction.

{¶ 17} Finally, it is undisputed that appellant's attorney, Walter Musgrove III, initiated contact with the Mockensturm Defendants, and both Mr. Musgrove and Mr. Gazian continued the contact after knowing the Mockensturm Defendants were not engaged for appellant's funding transaction with CLS. Inexplicably, Mr. Gazian unilaterally chose to pursue contact with the Mockensturm Defendants. When asked at his deposition, "You relied on the advice of Walter Musgrove when you signed this document [the Loan Commitment]?" Mr. Gazian replied, "Not true. I did not. * * * I used my judgment based on my understanding of our communication with Mockensturm." Later, Mr. Gazian testified that signing the Loan Commitment on November 5, 2018, "was my own decision. But [Mr. Musgrove] reviewed the document and said that I don't see anything else that may cause as (sic.) a problem, so it's up to you." More specifically, when Mr. Gazian was asked, "But Mr. Musgrove didn't find out that CLS would defraud you, did he?" the response was, "Mr. Musgrove did not rely on CLS' representation at all, because I told Walter, I am not going to get this deal done unless we have a representation and legal representative (sic.) [from the Mockensturm Defendants]."

{¶ 18} We find appellant presents no evidence to establish the Mockensturm Defendants had a duty to disclose any material fact to appellant for the arms' length

11.

funding deal it sought with CLS. "Ordinarily in business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other." *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 101, 519 N.E.2d 363 (1988). Determining the existence of a duty is a question of law. *Estate of Ciotto v. Hinkle*, 2019-Ohio-3809, 145 N.E.3d 1013, ¶ 13 (6th Dist.). Mr. Garzian testified at his deposition, that, although he was an experienced land developer, he lacked the assets and other criteria to be eligible for a $10 million loan from any other lender, large or small, and, instead, exclusively pursued CLS. It was Mr. Gazian's sole business decision to exclusively pursue funding from CLS hoping that CLS would only rely on adopting his vision for the real estate development potential and not on who the borrower was. We do not find any evidence from appellant that the Mockensturm Defendants had a duty to investigate CLS in any manner and report those results to appellant. *Fornshell v. Roetzel & Andress, L.P.A.*, 8th Dist. Cuyahoga No. 92132, 2009-Ohio-2728, ¶ 48.

{¶ 19} Upon de novo review of the evidence most favorable to appellant for summary judgment purposes, we find appellant's evidentiary support for fraudulent inducement fails to show that the five allegedly "manipulative, lying, and deceitful" statements are genuine issues of material fact. Appellant's own summary of the alleged representations made by Mr. Rehkopf to Mr. Musgrove three weeks prior to appellant

12.

signing the Loan Commitment were not ignored by the trial court and contradict appellant's conclusion they are "manipulative, lying, and deceitful." The trial court's March 24, 2021 journalized entry recites verbatim from the record Mr. Musgrove's October 19 email to Mr. Rehkopf unilaterally summarizing their telephone conversation:

Per our conversation, you were able to confirm that you and Mockensturm have provided legal representation to CLS in connection with the documents used for its loans. At the present time, you have not been asked to draft any documents relating to any loans concerning my client, but if requested by your client, CLS, you would be involved in drafting the loan documents. The scope of your representation has also included serving as escrow attorney in which you have held broker fees related to loans made by CLS. You also confirmed that most of your communication with CLS has been through its president Mr. Ray Uballe.

{¶ 20} By the foregoing, we find that appellant acknowledges the truth of the first, second, third, and fifth statements. As for whether "CLS was a legitimate legal entity" portion of the first statement and the fourth statement, we find the trial court also did not ignore those issues.

{¶ 21} First, the trial court's October 29, 2021 journalized entry states appellant's August 19, 2021 motion to dismiss the counterclaims by CLS "was the first time Plaintiff

13.

raised the allegation that CLS lacked legal existence." Thus, appellant failed to raise the issue with the trial court prior to the March 24 entry being appealed.

{¶ 22} Second, we further agree with the trial court's March 24 analysis of the allegedly "manipulative, lying, and deceitful" fourth statement:

> [W]hile Musgrove also stated by affidavit that Rehkopf had "reassured" him that "Uballe was capable of closing" the $10 million dollar loan under the Loan Commitment, Musgrove later clarified at deposition, "No, [Rehkopf] did not assure me. He didn't say, 'I guarantee you that they could lend $10 million.'" As pointed out by the Mockensturm Defendants, an affidavit which contradicts deposition testimony does not, without sufficient explanation, create an issue of fact precluding summary judgment. Absent such sufficient explanation, the Court finds Plaintiff's fraud/misrepresentation claim against the Mockensturm Defendants fails on this ground alone. (Citations omitted.)

{¶ 23} The Ohio Supreme Court has determined "that an affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment." *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 28. In addition, appellant's self-serving assertions in the record that baldly contradict appellee's supported motion, without Civ.R. 56 corroborating evidence, does

14.

not alone demonstrate a genuine issue of material fact. *White v. Sears, Roebuck & Co.*, 10th Dist. Franklin No. 10AP-294, 2011-Ohio-204, ¶ 8-9; *SRS Distrib., Inc. v. Axis All., LLC*, 2020-Ohio-1529, 153 N.E.3d 953, ¶ 14 (2d Dist.). Otherwise, a party can simply avoid summary judgment in all circumstances, and abrogate the utility of summary judgment, by submitting a self-serving affidavit that merely contradicts the movant's supported motion. *White* at ¶ 8.

{¶ 24} Nor does Mr. Gazian's deposition testimony bolster the contradictions between Mr. Musgrove's affidavit and his own deposition testimony. Mr. Gazian repeatedly testified during his deposition that "tricky words" appeared wherever the final, binding Loan Commitment content differed from his assumptions, such as stating CLS was a "lender" and not a "direct lender." For example, when Mr. Gazian conceded the Loan Commitment never uses the label "direct lender" for CLS, he said it was somehow implied: "It's a language that is indirect that says he is a direct lender. Okay?" This is after Mr. Gazian directed every revision to the Loan Commitment that Mr. Musgrove negotiated with CLS – all without any involvement of the Mockensturm Defendants. Mr. Gazian testified he intentionally did not direct Mr. Musgrove to clarify that the $10 million loan was "guaranteed" without conditions because he deemed all conditions irrelevant: "Well, I left it [the conditions precedent] there because I knew it really doesn't matter." Yet, the Loan Commitment clearly contains an integration clause, which Mr. Gazian kept. When asked at his deposition, "And you understand that this document

supersedes all prior correspondence, other agreements and oral or other communications, and you understand that?," Mr. Gazian replied, "Yes, to my understanding, we are only talking from this contract on, not anything behind, right."

{¶ 25} Upon de novo review, we find none of the foregoing five statements are genuine issues of material fact affecting the outcome of the litigation because, when viewing such evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, and appellant fails to support a claim of fraudulent inducement by the Mockensturm Defendants.

### 2. The CLS Defendants

{¶ 26} Appellant's fraudulent inducement claim against the CLS Defendants is similar to the claim against the Mockensturm Defendants: "The fraud in this case was not the breach of contract – the fraud occurred when the other party on the contract made misrepresentations in order to facilitate the agreement and unjustly collect commitment fees." Appellant argues the following are eight false statements by the CLS Defendants that the trial court failed to consider in its summary judgment decision: (1) "being a director of CLS with multiple managing directors and a committee"; (2) "being represented by Mockensturm, Ltd. Law firm"; (3) "having hundreds of millions to lend $10 million"; (4) "holding out Helen Odom as an employee of CLS"; (5) "having the loan approved and guaranteed for $10 million by CLS committee (Uballe Dep. P. 74-76)"; (6) "closing many loans with MFG [Momentum Financial Group, LLC, a financial

guarantor] and Mockensturms" (sic.); (7) "that CLS was a lender and not a broker (Uballe Dep. P. 28)"; and (8) "an interrogatory response that CLS was a loan underwriter (Uballe Dep. P. 51)."

{¶ 27} Pursuant to Civ.R. 56(E), appellant has the burden to defeat the CLS Defendants' summary judgment motion by specifically showing in the record that the foregoing eight issues are genuine issues of material facts for trial. However, upon de novo review, we find appellant merely declares the CLS Defendants acted fraudulently and points to only three parts of Mr. Uballe's deposition testimony as evidence of the court's need to "pierce the corporate veil" to reach Mr. Uballe's role using "the corporation as a way to commit fraud." The trial court's March 24, 2021 journalized entry dismissed Mr. Uballe with prejudice from appellant's fraud claim because "Plaintiff cannot pierce the corporate veil" absent fraud, which was not found. We agree.

{¶ 28} Appellant has the burden to prove the following three-part test to pierce the corporate veil:

Thus, the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the

corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 289, 617 N.E.2d 1075 (1993). The Ohio Supreme Court subsequently determined appellant has the burden for the second prong of the *Belvedere* test to "demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act. Courts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, ¶ 29.

{¶ 29} Upon our de novo review we agree with the trial court that appellant failed to meet its burden to pierce the corporate veil. The trial court stated that appellant's "support for these allegations, on review, is conclusory and otherwise unsupported by the record," citing *Youssef v. Parr, Inc.*, 69 Ohio App.3d 679, 689, 591 N.E.2d 762 (8th Dist.1990) (an affiant opposing summary judgment pursuant to Civ.R. 56(E) must set forth facts, not legal conclusions). For example, even after viewing appellant's evidentiary support most favorable to it for summary judgment purposes, despite appellant's emphasis that CLS pretending to have Helen Odom as an employee is "a pattern of fraud and misrepresentation," appellant fails to show why this fact is both

18.

genuine and material necessitating a trial, particularly where CLS did not support its motion for summary judgment relying on Helen Odum's employment status.

{¶ 30} Appellant also fails to point to any part of the record to indicate the business transaction between appellant and CLS was other than an ordinary, arm's length business transaction, such that the CLS Defendants had "no duty to disclose material information to the other [party].'" *BAS Broadcasting,* 2018-Ohio-1324, 110 N.E.3d 171, at ¶ 20, quoting *Blon* at 101. Nor does appellant show where the record contains material facts of special circumstances to transform the ordinary debtor-creditor business transaction between CLS and appellant into a fiduciary relationship. *U.S. Bank N.A. as Tr. of Holders of J.P. Morgan Mtge. Acquisition Tr. 2006-CH2 v. Hill*, 6th Dist. Ottawa No. OT-17-029, 2018-Ohio-4532, ¶ 52.

{¶ 31} We next turn to the three specific parts of the record identified by appellant to support its summary judgment opposition to support its fraudulent inducement claim. First, appellant specifically points to page 28 of Mr. Uballe's deposition transcript as evidence "that CLS was a lender and not a broker." However, Mr. Uballe's deposition on page 28 demonstrates the opposite when he answered "yes" to this specific question: "And that's predominantly what CLS Capital does, isn't that correct, broker deals between one party and to the other party?" Such evidence does not support appellant's summary judgment burden.

19.

{¶ 32} Second, appellant points to page 51 of Mr. Uballe's deposition transcript as evidence of "an interrogatory response that CLS was a loan underwriter." Appellant refers to interrogatory No. seven, which asked CLS, "Please indicate what CLS's role in this loan or transaction was, identify the lender by name, identify the financial guarantor by name, identify the underwriter by name, and who was the law firm identified in [the] loan commitment and what documents support CLS's position." CLS's response to that interrogatory complied with Civ.R. 33(A)(3) as follows:

Objection. This interrogatory is vague, ambiguous, overly broad, unduly burdensome and oppressive, not relevant nor calculated to lead to the discovery of admissible evidence and, further, seeks material protected by the attorney/client or other privilege and the work product doctrine. Without waiving said objection and to the extent the answering party understands this confusing and unclear request, CLS was the loan underwriter. Momentum Financial Group, LLC was providing the financial guarantee. The law firm was going to be retained to prepare closing documents upon approval of the financial guarantee by MFG which did not occur due to Plaintiff's own actions and misrepresentations.

{¶ 33} We find that such evidence does not support appellant's burden, particularly when Mr. Musgrove and Mr. Gazian each testified at their depositions of their understanding that Mr. Rehkopf was the "underwriter," meaning the person

20.

preparing the loan documents.  It is undisputed appellant's funding deal with CLS never reached the point of loan document preparation.[13]  Mr. Musgrove then testified that prior to the November 5, 2018 Loan Commitment, he and Mr. Garzian knew MFG was the financial guarantor to "underwrite" the $10 million deal sought by appellant from CLS. This is corroborated by Mr. Uballe's deposition testimony, also at page 51 of the transcript, where he explained CLS' response to appellant's interrogatory No. seven:

> I'm not the one issuing the financial guarantee so * * * we do a underwriting for the first part to see if it's even worthy of doing the transaction. * * * I'm clarifying for you. * * * It doesn't say here that we issued the financial guarantee, either, does it? We're not the issuer of the financial guarantee, so.  The part of CLS, we underwrite what we need for CLS.

{¶ 34} Third, appellant points to pages 74-76 of Mr. Uballe's deposition transcript as evidence of "having the loan approved and guaranteed for $10 million by CLS committee."  In those transcript pages, appellant referenced exhibits to the transcript containing lengthy email chains between representatives from appellant and appellee CLS occurring prior to the signed Loan Commitment dated November 5, 2018.  We

---

[13] The trial court determined in its September 11, 2020 journalized entry, which appellant does not appeal: "[T]he allegations and evidence unambiguously establish that the Mockensturm [D]efendants *would* become involved in the proceedings of the loan transaction *only after acquisition of the loan*.  It is undisputed that the subject loan was never acquired."  (Emphasis sic.)

21.

know from Mr. Gazian that he directed all of the negotiations with CLS leading up to the final, binding, November 5, 2018 Loan Commitment. At one point on October 16, 2018, CLS states, "Yes Mr. Gazian has been approved and CLS is the actual Lender." However, that statement is not false. The transcript exhibits contain additional information that demonstrates appellant understood as of October 16, the "FG [financial guarantee] provider is an independent third party" and was identified by name as Momentum Financial Group, LLC or MFG. Further, on October 19, Mr. Uballe wrote to both Mr. Gazian and Mr. Musgrove, "I'm curious as to the constant inquiries about MFG. MFG is guaranteeing CLS (as we are the Lender). MFG will underwrite 99.99% of what's approved by CLS." That is consistent with the explanation from page 51 of Mr. Uballe's deposition transcript that: CLS approved its portion of the evaluation of the financial transaction; CLS was not the financial guarantor; and CLS did not control the financial guarantor's independent review.

{¶ 35} Upon de novo review, we find none of the foregoing eight statements are genuine issues of material fact affecting the outcome of the litigation because, when viewing such evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, and appellant fails to support a claim of fraudulent inducement by the CLS Defendants.

{¶ 36} Finally, the trial court further determined in its journalized entry, "In any event, the Court finds the terms of the conditional Loan Commitment govern the parties'

22.

interactions on these very same issues, rendering further review of these allegations unnecessary." Again, we agree.

{¶ 37} The essence of appellant's fraudulent inducement allegation is that the CLS Defendants misrepresented facts to induce appellant to sign the Loan Commitment and pay the $75,000 commitment fee on the promise of receiving $10 million. According to Mr. Gazian's testimony, the absence of receiving the promised $10 million resulted in all of appellant's alleged damages. A claim for fraud that duplicates a contract claim is not viable. *Dayton Children's Hosp. v. Garrett Day, LLC*, 2019-Ohio-4875, 149 N.E.3d 1004, ¶ 105-111 (2d Dist.). Since appellant's causes of action for fraudulent inducement and breach of contract (discussed below) are factually intertwined, the fraudulent inducement claim will fail as a matter of law unless appellant shows that the tort claim exists notwithstanding the contract and that there are additional, actual damages attributable to the fraudulent inducement claim separate from those attributed to the breach of contract claim. *U.S. Bank N. A. v. MMCO, L.L.C.*, 2021-Ohio-4605, 183 N.E.3d 499, ¶ 53 (8th Dist.). A tort claim based upon the same actions as a breach of contract fails as a matter of law where no duty is owed in the absence of the obligations under the contract, i.e. the duty is owed even if no contract existed. *LaBounty v. Big 3 Automotive*, 6th Dist. Ottawa No. OT-18-022, 2019-Ohio-1919, ¶ 88, citing *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 151, 684 N.E.2d 1261 (9th

23.

Dist.1996). Appellant, again, does not meet its burden, and the claim for fraudulent inducement by the CLS Defendants also fails as a matter of law.

### C. Deceptive Trade Practices (R.C. 4165.02)

{¶ 38} Appellant's amended complaint styles count No. 6 as "Deceptive Trade Practices," made pursuant to R.C. Chapter 4165, and alleges the following: (1) "Defendant's false, deceptive and misleading statements about being a lender and in the loan commitment induced Plaintiff's reliance on said statements"; (2) "Defendants have shipped/delivered the loan commitment through the channels of interstate and intra-state commerce"; (3) "Defendants made false and misleading statements about being lender and loan commitment in violation of" R.C. 4165.02(A)(1)-(3), (7); (4) "Defendants' conduct as described herein was done in connection with the sale of financing in Ohio"; (5) "Defendants' conduct caused confusion or deceived Plaintiff"; (6) "There has been actual deception, or, in the alternative, at least a tendency to deceive Plaintiff"; (7) "Defendants' deceptive acts are material in that they influenced the decisions of Plaintiff"; (8) "Defendants' actions violate Ohio's Deceptive Trade Practices Act * * * and Ohio's common law"; and (9) "As a direct and proximate cause of Defendants' conduct, said reliance caused damages including the loss for expected and foreseen profits from the intended real estate development, loss of the contract to purchase land subject to lending transaction, loss of $97,000 real estate commission paid to Ken Gazian intended for the project use, loss of $75,000 commitment fee pledge for the loan, loss of

24.

use of funds, and loss of $10,000 earnest money deposit pledged with the title company. The damages are in excess of $3 million dollars."

{¶ 39} Mr. Gazian's testified at his deposition that he is familiar with deceptive trade practices, and explained, "It's under fraud. In Texas, it would be under certain rules. I did not know if it [is] applicable in Ohio, but apparently it is, so, yeah. It's there." On appeal, appellant argues that "misleading statements were made, it was intended to deceive the intended audience, it influenced the consumer's purchasing decisions, it was introduced into interstate commerce, and there was a link between the statements and the harm to the plaintiff. The absence of case law does not preclude recovery on this type of case when the elements are present." Appellant then relies on the trial court's October 29, 2021 journalized entry, which did not determine summary judgment on the deceptive trade practices claim: that CLS did not exist ("no Board, no valid corporation") at the time CLS assigned the Loan Commitment to Comprehensive. Our de novo review is limited to the record available as of the March 24, 2021 journalized entry upon which summary judgment was determined.

{¶ 40} Appellant's cause of action alleges four violations of R.C. 4165.02(A).

A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following: (1) Passes off goods or services as those of another; (2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship,

approval, or certification of goods or services; (3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; * * * (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; * * *.

Appellant also alleges a violation under common law, which can be asserted in tandem. R.C. 4165.02(C).

{¶ 41} The trial court determined in its March 24, 2021 journalized entry that appellant opposed summary judgment using the same alleged false statements supporting its fraud claims, i.e., "for false and misleading advertising under the Ohio Deceptive Trade Practices Act," and evaluated this claim under the five-part test stated in *HER, Inc. v. RE/MAX First Choice, LLC*, 468 F.Supp.2d 964, 979 (S.D.Ohio 2007). We agree, as liability under the Ohio Deceptive Trade Practices Act is appropriately analyzed under the analogous federal Lantham Act for unfair competition. *Id.*; *Enduring Wellness, L.L.C. v. Roizen*, 8th Dist. Cuyahoga No. 108681, 2020-Ohio-3180, ¶ 46. Appellant's common law claims are also subject to the same analysis. *Torrance v. Rom*, 8th Dist. Cuyahoga No. 108818, 2020-Ohio-3971, 157 N.E.3d 172, ¶ 47, citing *Cesare v. Work*, 36 Ohio App.3d 26, 28, 520 N.E.2d 586 (9th Dist.1987).

26.

**{¶ 42}** Thus, appellant has the burden to show:

(1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff. (Citations omitted.)

*Enduring Wellness* at ¶ 47. When seeking damages for false advertising, the plaintiff must present evidence that a significant portion of the consumer population was deceived by it. *Id.* at ¶ 49.

**{¶ 43}** Appellant fails to meet its burden. Even if we were to accept that CLS made a false statement of fact concerning the terms of the Loan Commitment, appellant has not, for example, shown that such statement deceived or tended to deceive a significant portion of the public seeking loans from CLS. As a further example, appellant has not shown that a significant portion of the public seeking loans from CLS were likely confused about the "source of the goods and services." *Wooster Floral & Gifts, L.L.C. v. Green Thumb Floral & Garden Ctr., Inc.*, 164 Ohio St.3d 57, 2020-Ohio-5614, 172 N.E.3d 60, ¶ 17, citing R.C. 4165.02(A)(2).

27.

**{¶ 44}** Upon de novo review, we find none of the foregoing issues are material facts affecting the outcome of the litigation because, when viewing such evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion that appellant fails to support a claim of deceptive trade practices by the CLS Defendants.

**{¶ 45}** Appellant's first assignment of error is not well-taken.

### III. Reciprocal Breach of Contract Claims

**{¶ 46}** Appellant's second assignment of error challenges as against the manifest weight of the evidence the trial court's October 29, 2021 journalized decision dismissing appellant's breach of contract claim against CLS. Appellant's arguments echo its fraudulent inducement claim against CLS. Appellant argues that it detrimentally relied upon Mr. Uballe's[14] assurances, "as secondary from the assertions and representations made by Mockensturms (sic.)," that CLS "won't request any documents from Pierre Investments, Inc. that may interfere with funding of the approved loan." Appellant concludes, "Upon being told in writing that no further documents were needed and that the loan had been approved, it was reasonable for the plaintiff/appellant to believe that the loan agreement was in effect and legitimate."

---

[14] The trial court determined that "Uballe, individually, has already been dismissed as a party in this matter and is no longer before the Court as a defendant or plaintiff." Mr. Uballe's dismissal was determined by the trial court's March 24, 2021 journalized entry, and we previously found no trial court error regarding appellant's first assignment of error challenging that journal entry.

28.

**{¶ 47}** "We review a trial court's judgment following a bench trial under the manifest weight of the evidence standard." *Zak v. Airhart*, 6th Dist. Lucas No. L-21-1052, 2021-Ohio-4399, ¶ 42. In such review, "we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way in resolving conflicts in the evidence, creating such a manifest miscarriage of justice that reversal and a new trial are necessary." *Id.* We will not reverse the trial court's judgment if the essential elements of the case are supported by some competent, credible evidence in the record. *Id.* The essential elements of appellant's breach of contract claim against CLS are "by a preponderance of the evidence that: '(1) the parties reached a valid and binding agreement; (2) that the defendant breached the terms of that agreement; and (3) that the nonbreaching party suffered damages as a result of the breach of contract.'" (Citations omitted.) *Baker v. Lifeline Field Marketing, LLC*, 2017-Ohio-5675, 93 N.E.3d 1231, ¶ 21 (6th Dist.).

**{¶ 48}** It is undisputed that the subject of the reciprocal breach of contract claims is the November 5, 2018 written Loan Commitment signed by Mr. Gazian for appellant and signed by Mr. Uballe for CLS. Mr. Gazian's initials also appear on each page of the five-page document, with an exhibit attached. Both sides argue the Loan Commitment is a valid, binding contract which the other side breached. Appellant alleges CLS breached the Loan Commitment by not being a "direct lender" for the "guaranteed" $10 million loan and by relying on a financial guarantor's participation in the loan. CLS alleges

29.

appellant breached the Loan Commitment by failing to satisfactorily meet all conditions precedent to funding and by failing to abide by the indemnity clause.[15] Further, neither party disputes the trial court's determination that the contract assigned by CLS to Comprehensive on June 9, 2020, was not the November 5, 2018 signed agreement, but an unsigned draft dated October 16, 2018.[16]

{¶ 49} As a preliminary matter, it is undisputed that the Loan Commitment explicitly states the parties' agreement is "intended to be governed and constructed in accordance with Delaware Law without regard to its conflict of law provisions." The law of the state chosen by the parties governs their contractual rights and duties. *Morse v. Reiser*, 6th Dist. Wood No. WD-02-048, 2003-Ohio-3451, ¶ 7, citing *Ohayon v. Safeco Ins. Co. of Illinois*, 91 Ohio St.3d 474, 477, 747 N.E.2d 206 (2001). According to the trial court, the determination of CLS' legal non-existence under Delaware law was dispositive on the reciprocal breach of contract claims. We agree.

---

[15] CLS did not appeal the trial court's dismissal of CLS' breach of contract counterclaim against appellant.

[16] The trial court determined "to the extent there was any contract between Plaintiff and Comprehensive, Plaintiff failed to perform to an objective standard of reasonableness." Ultimately, the trial court rendered a verdict for Comprehensive on appellant's breach of contract claim. We disregard the second assignment of error with respect to Comprehensive for appellant's failure to separately argue the trial court's error. Also, Comprehensive did not appeal the trial court's verdict for appellant on Comprehensive's breach of contract counterclaim against appellant.

30.

{¶ 50} The trial court's October 29, 2021 journalized entry, over CLS' objection[17] and with appellant's support, took "judicial notice that Defendant, CLS Capital Group, Inc., is no longer in existence and became inoperative and void as of March 1, 2012, as indicated by the public records available through the Delaware Secretary of State." Evid.R. 201(B). The trial court found that while both Ohio and Delaware statutes recognize the capacity to windup affairs by an entity whose articles of incorporation have been cancelled, the windup period is limited to five and three years after cancellation, respectively. R.C. 1701.88(A) and Del.Code Ann., Title 8, Sec. 278.[18] The Delaware Court of Chancery may direct "for such longer period" the legal existence of a

---

[17] CLS argued appellant's proffer of CLS' non-existence was properly not admitted at trial. CLS further argued the Delaware Division of Corporations website shows two separate entities named CLS Capital Group, Inc. with separate file numbers, and the trial court took judicial notice of only one of the two entities. However, the trial court's entry states, "the Court believes that the existence of the issue should, at least, be made a part of the record, particularly in light of Uballe's testimony as to CLS' non-existence at trial." CLS did not appeal the decision taking judicial notice of CLS' non-existence.

[18] The statute states, in relevant part: "All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of * * * defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, * * * but not for the purpose of continuing the business for which the corporation was organized. With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3-year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery."

31.

corporation. *Id.* However, we find no evidence in the record of such direction of an extension by the Delaware Court of Chancery. Nor do we find any evidence in the record that CLS "continued as a body corporate" because appellant did not commence its litigation during CLS's windup period. *Id.*

{¶ 51} Thus, CLS's legal capacity to be sued by appellant on October 28, 2019, for breach of the Loan Commitment was beyond the Delaware statutory windup period following its March 1, 2012 dissolution. *O'Dell v. Dana Corp.*, 3d Dist. Crawford No. 3-94-5, 1994 WL 424064, *2 (Aug. 9, 1994), citing Del.Code Ann., Title 8, Sec. 278 (trial court properly dismissed appellant's complaint against defendant-appellee, a Delaware corporation, which had no capacity to be sued more than three years from the date of dissolution); *In re Altaba, Inc.*, 264 A.3d 1138, 1153 (Del.Ch. 2021), quoting Del.Code Ann., Title 8, Sec. 278 (the windup period begins when a Delaware corporation dissolves for the purposes stated in the statute, including defending suits, "but not for the purpose of continuing the business for which the corporation was organized"). We find no evidence in the record that entering into the Loan Commitment was a corporate act by CLS during the windup period. *Id.*; *see Jasin v. Wolfgang Doerschlag Architects, Ltd., Inc.*, 6th Dist. Lucas No. L-84-185, 1984 WL 3691, *2-4 (Dec. 14, 1984), citing *Commonwealth Tel. Co. v. Bowers*, 174 Ohio St. 141, 187 N.E.2d 30 (1962), syllabus (under analogous Ohio statute, cancellation of articles of incorporation all corporate powers are prohibited except for those necessary to wind up corporate business).

32.

{¶ 52} The trial court cited Civ.R. 17(B), and *Patterson v. V & M Auto Body*, 63 Ohio St.3d 573, 574, 589 N.E.2d 1306 (1992) to determine the legal consequence of CLS' nonexistence as of March 1, 2012, because "[i]t is well established that both plaintiff and defendant in a lawsuit must be legal entities with the capacity to be sued." As explained by the Ohio Supreme Court, "If a defendant in a lawsuit is not an actual or legal entity, then any judgment rendered against that entity is void." *Id.* at 576, citing *Cobble v. Farmers' Bank*, 63 Ohio St. 528, 540, 59 N.E. 221 (1900) (a judgment is invalid where "there was no party to the suit in whose favor a valid judgment could be rendered"). As further explained by the Ohio Supreme Court, an action may only be brought against a party who actually or legally exists and has the capacity to be sued. *Baker v. McKnight*, 4 Ohio St.3d 125, 127, 447 N.E.2d 104 (1983). This court recognizes that any judgment against a defendant which is not a legal entity is void. *Hartley v. Clearview Equine Veterinary Servs.*, 6th Dist. Lucas No. L-04-1163, 2005-Ohio-799, ¶ 7.

{¶ 53} A void judgment is a legal nullity as if it never occurred. *See State ex rel. Haley v. Davis*, 145 Ohio St.3d 297, 2016-Ohio-534, 49 N.E.3d 279, ¶ 13; *Patasce v. Stambaugh Garage*, 11th Dist. Trumbull No. 91-T-4594, 1992 WL 208564, *4 (Aug. 28, 1992) ("Any judgment rendered against a non-legal entity is a nullity"). The trial court has the inherent authority to vacate a judgment entered against a nonentity. *Davis* at ¶ 13, citing *Hartley* at ¶ 9. However, we agree with the trial court when it determined, "being

33.

disinclined to issue a void judgment, [the court] is similarly disinclined to issue a judgment for or against a non-existent entity." The trial court lamented, "Plaintiff could have saved all parties involved considerable time and resources by raising the non-existence issue sooner, perhaps even before filing the instant lawsuit." As a result, the trial court dismissed outright appellant's breach of contract claim against CLS, a non-existent entity, and dismissed CLS's[19] breach of contract indemnification claim against appellant. We agree.

{¶ 54} Appellant's arguments supporting this second assignment of error are silent regarding the foregoing legal consequence of CLS's nonexistence and its capacity to be sued. Appellant merely repeats the essence of its fraudulent inducement claims to reach CLS and Mr. Uballe, which we have found not well-taken. The record contains appellant's October 21, 2021 brief supporting the trial court's notice of intent to take judicial notice that CLS ceased legal existence as of March 1, 2012, and merely announces:

> R.C. 1703.29 does not affect Plaintiff's claim against the defunct corporation. Public policy gives Plaintiff the right to file suit against any defunct corporation that continues to do business as if they were still in

---

[19] The trial court determined that CLS did not validly assign the Loan Commitment to Comprehensive for two reasons: "there was no corporate resolution authorizing CLS to make the assignment" and "the contract referenced in the assignment was not the actual contract entered into between Plaintiff and CLS on November 5, 2018."

34.

business.  Here, corporate documents were used by a former co-director to make it appear that the corporation was still in business, therefore CLS Capital Group Inc. is a proper party.

{¶ 55} Appellant provides no legal authority for its foregoing pronouncement.  To the extent appellant relies on *P.K. Springfield, Inc. v. Hogan*, 86 Ohio App.3d 764, 621 N.E.2d 1253 (2d Dist.1993), such reliance is misplaced, as the court stated, "R.C. 1703.29(A) specifically provides that an unlicensed corporation may not *maintain an action* until it acquires an Ohio license."  (Emphasis sic.) *Id.* at 771.  Specifically, the plain language of R.C. 1703.29(A) does not authorize appellant's "claim against the defunct corporation."  Rather, it states, in part, "The failure of any corporation to obtain a license under [R.C. 1703.01 to 1703.31], does not affect the validity of any contract with such corporation, but no foreign corporation that should have obtained such license shall maintain any action in any court until it has obtained such license." R.C. 1703.29(A). Appellant is appealing the trial court's dismissal of appellant's breach of contract claim against CLS, not the opposite.

{¶ 56} Furthermore, R.C. 1703.29(A) does not support appellant's position because it addresses CLS's defense to appellant's litigation, which it did.  "R.C. 1703.29(A) does not prevent an unlicensed corporation from defending a suit brought against it in Ohio."  *P.K. Springfield* at 769, citing *Colegrove v. Handler*, 34 Ohio App.3d 142, 145, 517 N.E.2d 979 (10th Dist.1986).

35.

{¶ 57} We find the trial court's decision dismissing appellant's breach of contract claim against CLS is not against the manifest weight of the evidence. There is some competent, credible evidence in the record showing CLS lacked the capacity to be sued due to CLS's legal non-existence.

{¶ 58} Appellant's second assignment of error is not well-taken.

### IV. Conclusion

{¶ 59} On consideration whereof, the judgments of the Lucas County Court of Common Pleas are affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.        _____
                                     JUDGE
Thomas J. Osowik, J.       

Gene A. Zmuda, J.        _____
CONCUR.                                     JUDGE

_____
                                     JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

37.